Filed 10/22/24  P. v. Washington CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B330275 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA157897) |
| v. | |
| JUSTIN WASHINGTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Michelle M. Ahnn and John J. Lonergan, Jr., Judges.  Affirmed.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

—————————

In an information filed by the Los Angeles County District Attorney's Office, defendant and appellant Justin Washington was charged with first degree willful, deliberate, and premeditated murder. (Pen. Code, §§ 187, subd. (a), 189.)[1] It was further alleged that defendant personally used a firearm (§ 12022.5, subd. (a)) and had incurred two prior serious or violent felony "strike" convictions (§§ 667, subd. (d), 1170.12, subd. (b)).

Defendant's initial trial resulted in a mistrial because the jury deadlocked. Following retrial, the jury found defendant guilty as charged and found the firearm allegation true. In a bifurcated proceeding, the trial court found the two prior strike allegations true. Defendant was sentenced to a term of 75 years to life plus three years in state prison.

Defendant timely filed a notice of appeal.

We affirm.

## FACTUAL BACKGROUND

I. *Prosecution evidence*

A. <u>The November 4, 2020, murder</u>

On November 4, 2020, at about 5:40 p.m., Los Angeles Police Department (LAPD) officers, including Officer John Byun, drove to a location near Figueroa Street and 109th Street in Los Angeles in response to a 911 call reporting a shooting. Bystanders directed Officer Byun to the victim, Bryan Castle (Castle), who was lying facedown on the sidewalk and had several gunshot wounds. Castle died as a result of the gunshot wounds.

Police recovered a fired bullet and two nine-millimeter "GFL" brand Luger bullet casings from the crime scene.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

B. <u>Video of the murder</u>

Officers obtained surveillance video of the shooting. The video was played at trial.

The video showed Castle walking through an auto mechanic's shop to the intersection of 109th and Figueroa. A white sedan with a moonroof stopped near Castle. Someone was sitting in the front passenger seat. A person later identified as defendant exited the rear passenger side, walked around to the driver's side, and faced Castle. Defendant wore a dark sweater with a white stripe on the sleeve. Defendant walked back to the passenger side of the vehicle, turned and faced Castle, and fired a weapon. Castle made his way back to the sidewalk and collapsed.

C. <u>Video of the day prior to the murder (Nov. 3, 2020)</u>

On November 12, 2020, LAPD Detectives Issac Fernandez and Peter McCoy went to an auto body shop near the crime scene to download surveillance video showing events that occurred on November 3, 2020, the day before the shooting. The police had received information that the suspected shooter may have been at the crime scene on that date.

The video showed a white Mercedes pull into the auto shop. A Hispanic woman later identified as Daisy Serrano (Serrano) exited the front passenger seat. A Black man later identified as defendant exited the rear passenger seat. Defendant, who has numerous tattoos, wore a white T-shirt with a Nike "Just do it" logo and a black LA Dodgers hat. The driver stayed in the Mercedes. Defendant and Serrano walked into the business that Castle worked for and then returned to the car.

Detective Francisco (Frank) Zaragoza recognized the woman on the video as Serrano. He was familiar with her from an unrelated investigation he handled in September 2020.

3

Detective Zaragoza obtained information from Serrano's social media accounts.

From the car's license plate, the police determined the Mercedes was registered to Rudy Bracamontes (Bracamontes), Serrano's brother.

D. November 24, 2020, arrest of Serrano, who had the murder weapon

On November 24, 2020, around 2:00 a.m., Los Angeles County deputy sheriffs contacted a vehicle at a parking lot near El Segundo Boulevard and Figueroa, about a mile and a half from the scene of Castle's murder. Serrano was the front seat passenger. The deputies recovered an operable firearm from the floorboard behind the driver's seat. They also recovered a magazine for the firearm, which was loaded with bullets. Serrano was arrested for possession of the firearm.[2] She provided her telephone number when she was booked.

Testing later established that Serrano's gun was used in Castle's murder.

E. December 5, 2020, arrest of defendant and searches of his home[3]

On December 5, 2020, Torrance police officers saw defendant leave his stepmother's home on 139th Street in Gardena. The police arrested defendant, who was in the front passenger seat of a car. He was wearing a black LA Dodgers baseball hat. The police recovered defendant's cell phone.

---

[2]   She later was convicted for possession of it.

[3]   Torrance police officers arrested defendant and searched his home as part of a separate investigation; he was the primary suspect in a series of robberies. Evidence of defendant's involvement in those robberies was not admitted in this retrial.

Torrance police officers searched the 139th Street address, which included a converted garage with two bedrooms, a kitchen, a bathroom, and a large living space, as well as a main residence with three bedrooms. Defendant's stepmother, Augusta Washington (Augusta),[4] directed the police officers to the bedroom in the main residence in which defendant was staying. In that bedroom, the police photographed a black Puma sweater with white stripes.

Defendant's sister, Tiffany Washington (Tiffany), lived in the converted garage with her children. From a bedroom in the converted garage, the police recovered paperwork addressed to defendant that was on top of a dresser. A drawer in that dresser contained five loose bullets and 17 bullets inside of a cloth bag; all of the bullets were nine-millimeter. One of the loose bullets was a "GFL" brand, the same brand as casings recovered from the crime scene and the bullets found in Serrano's gun.

The police also recovered a Smith & Wesson .45 caliber semiautomatic gun from the living room of the converted garage. The gun's magazine contained five .45 caliber bullets.

On March 4, 2021, LAPD officers conducted a second search of defendant's home. They recovered a T-shirt with a Nike "Just do it" logo similar to the shirt that defendant wore the day before the shooting as shown on video. The police also recovered a black Puma sweater with a white stripe on the sleeve, which was similar to what the shooter wore as shown on video.

F. <u>Three recorded jail calls between defendant and Serrano</u>

Defendant, who was in custody, had several calls with Serrano, which were recorded. Based upon what they called each

---

[4]     Because defendant and his mother and sister share the same last name, we refer to them by their first names. No disrespect is intended.

other during the calls, it appeared that they were in a relationship. Along with two other recorded calls, their January 8, 2021, phone call was played at the retrial. Detective Zaragoza heard defendant tell Serrano during that call, "'Remember when I was bustin' and your brother damn near ran me over.'" Detective Zaragoza understood defendant to mean that he was shooting because the phrase "'bustin' caps'" is "street talk of somebody saying shooting."

G. Information recovered from defendant's cell phone

On November 5, 2020, several internet searches were made on defendant's phone regarding a shooting in the area of the 110 Freeway and Figueroa, including "'shooting on 110 and Figueroa Street on October 4th'" and "'man shot to death at Figueroa auto shop on September 4th.'" The earliest search was made on November 5, 2020, at 1:38 a.m.

In late November 2020, defendant exchanged text messages with multiple people in an effort to purchase a gun because he no longer had his.

H. Mapping of locations of defendant, Serrano, and Bracamontes's cell phones

FBI Agent Jeff Bennett (Bennett), the prosecution's cell phone expert, testified that cell phone site analysis showed that defendant's phone was near the crime scene on November 4, 2020, at 5:32 p.m. and stayed in that area for about 20 minutes. Bracamontes's cell phone was near the crime scene between 4:44 p.m. and 4:51 p.m. Serrano's cell phone was in the area of the crime scene from 5:39 p.m. to 5:50 p.m. Both of their phones were near defendant's home minutes after the shooting.

II. *Defense evidence*

Augusta owned the home on West 139th Street. In November and December 2020, defendant lived in one of the bedrooms inside the main residence. Tiffany and Tiffany's

6

children lived in the back house. The main residence and back house had different keys.

Robert Aguero (Aguero), the defense cell phone expert, disagreed with the prosecution's cell phone expert about the accuracy of AT&T data sessions for cell phone mapping purposes. He opined that using data sessions and cell phone towers to map the location of a phone was not reliable. But, he agreed with the rest of Bennett's testimony.

III. *Rebuttal*

Among other evidence offered, Bennett rebutted Aguero's testimony.

## DISCUSSION

I. *Exclusion of evidence relating to an alleged <u>Perkins</u>[5] operation with Serrano*

Defendant argues that the trial court committed at least two errors relating to an alleged *Perkins* operation with Serrano. According to defendant, the trial court erred by (1) making a preliminary determination that no *Perkins* operation actually occurred, and then (2) excluding evidence to impeach Detectives Zaragoza and McCoy with their inconsistent testimonies concerning that alleged *Perkins* operation.

A. <u>Relevant proceedings</u>

1. *Detective Zaragoza's testimony at the August 19, 2021, preliminary hearing about a <u>Perkins</u> operation with Serrano and ensuing discovery motion*

On August 19, 2021, in Los Angeles County Superior Court case number TA153890, a preliminary hearing was held. At that time, defendant was charged with the murder of Castle, and Serrano and defendant were both charged with conspiracy to

---

[5] *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).

7

murder Castle. Detective Zaragoza testified that a *Perkins* operation had been conducted with Serrano.[6]

On November 8, 2021, defense counsel filed a motion asking for discovery regarding the *Perkins* operation. In support, defense cited to Detective Zaragoza's testimony as well as a "'Chrono'" or "Chronological Record" entry that mentioned a *Perkins* operation. The prosecution opposed the motion on the grounds that "[n]o such item exists, as there was no *Perkins* [o]peration of Daisy Serrano." According to defendant's opening brief, there was a hearing on this motion on November 21, 2021, but there is no indication as to how the trial court ruled on this issue.

2. *Detective McCoy's testimony at the August 5, 2022, preliminary hearing about a* <u>Perkins</u> *operation with Serrano and ensuing discovery motion*

On July 22, 2022, the prosecution announced that they were unable to proceed against defendant and Serrano. The case was refiled that same day as Los Angeles Superior Court case number TA157897.

On August 5, 2022, a preliminary hearing[7] was held. Detective McCoy testified in detail about a *Perkins* operation involving Serrano.

---

[6] The appellate record does not include a transcript of the August 19, 2021, preliminary hearing, but relevant testimony from that hearing is summarized in other parts of the record. For example, during defendant's initial trial, Detective Zaragoza testified that he had given brief prior testimony about a *Perkins* operation conducted with Serrano at an August 19, 2021, hearing (the preliminary hearing). He also testified that his preliminary hearing was mistaken—no *Perkins* operation had in fact been conducted with Serrano.

8

On August 30, 2022, defense counsel filed a motion for discovery of the *Perkins* operation. The prosecution responded, reiterating that no *Perkins* operation had been conducted with Serrano. Apparently, Detectives Zaragoza and McCoy had confused Serrano with another woman who had been arrested at around the same time, whose name—Zambrano—was similar to Serrano.

### 3. *September 2022 hearing at which both detectives testify that there was no Perkins operation with Serrano*

On September 30, 2022, the initial trial court (Hon. Connie R. Quiñones) held a hearing, at defendant's request, "to preserve the record" regarding whether a *Perkins* operation with Serrano had been conducted. Detective Zaragoza testified that after the August 2021 preliminary hearing, he realized that there had been no *Perkins* operation conducted with Serrano. Detective Zaragoza explained that he had "mixed up a name [Serrano's] with another unrelated arrest of a female with a similar last name." That woman's last name was "Zambrano," and her *Perkins* operation took place about two months after Serrano's arrest in March 2021.

There was no *Perkins* operation conducted on the day Serrano was arrested. While a *Perkins* operation with Serrano had been set for that day, it did not go forward because there was a "conflict regarding the *Perkins* agent and Ms. Serrano." Detective Zaragoza wrote an entry in the chronological record for this case indicating that a *Perkins* operation was set for March 4, 2021, but he did not update it to reflect that the operation did not actually occur. Detective Zaragoza also did not write any sort of supplemental report to note that no *Perkins* operation had been conducted with Serrano.

---

[7] The preliminary hearing judge found insufficient evidence of the conspiracy charge and dismissed the case against Serrano.

Detective McCoy testified that he was in court during the August 2021 preliminary hearing; he sat with the prosecutor when Detective Zaragoza testified that day. He did not attempt to correct Detective Zaragoza's testimony that a *Perkins* operation had taken place with Serrano. Also at that hearing, Detective McCoy did not tell the prosecutor that a *Perkins* operation had not taken place.

Detective McCoy acknowledged that at the August 2022 preliminary hearing he testified in detail about a *Perkins* operation with Serrano. But that *Perkins* operation did not occur. Like Detective Zaragoza, Detective McCoy had confused Serrano with Zambrano.

At the end of the hearing, the trial court stated: "We had the hearing conducted to preserve the record. You [counsel] have your record."

4. *Initial trial: motions, hearings, and testimony regarding the alleged Perkins operation*

At the first trial (Hon. Michelle M. Ahnn),[8] there were several motions and hearings regarding the admissibility of the detectives' preliminary hearing testimonies that a *Perkins* operation had been conducted with Serrano, as well as their later admissions no such operation occurred. The trial court ruled that the parties could only ask Detective Zaragoza certain questions about the topic for the limited purpose of assessing Detective Zaragoza's credibility.[9]

---

[8]    The same prosecutor handled both the initial trial and the retrial.

[9]    The permitted questions were: (1) whether Detective Zaragoza testified at a prior hearing; (2) whether he was under oath at that hearing; (3) whether he was asked "'[W]as a *Perkins* operation done'"; (4) questions eliciting the definition of a *Perkins* operation; (5) whether he testified at the prior hearing that a

10

Detective Zaragoza testified that no *Perkins* operation had been conducted with Serrano. He acknowledged at an August 19, 2021 hearing, he had testified that there was a *Perkins* operation with Serrano, and that at a September 2022 hearing, he admitted that his August 2021 testimony was mistaken.

The trial court denied defendant's request to call Detective McCoy to testify regarding the alleged *Perkins* operation, reasoning that because Detective McCoy was not a witness at trial, his credibility was not at issue.

5. *Rulings in the retrial*

As is relevant to the issues on appeal, the trial court made two related rulings: (1) the defense could not ask the detectives questions in front of the jury whether a *Perkins* operation had been conducted with Serrano because the defense had not made a sufficient offer of proof that the operation actually had been conducted; and (2) the detectives' prior testimonies (at both preliminary hearings and at the September 2022 hearing) were inadmissible because they were irrelevant and because there was no evidence that a *Perkins* operation had been conducted with Serrano. But, if evidence that a *Perkins* operation had actually been conducted "c[a]me to light," it would address that issue at that time.

---

*Perkins* operation was conducted in this case, with the answer as "yes"; (6) whether a *Perkins* operation was actually done, with the answer as "no"; (7) questions about the specific questions and answers from the prior hearing; and (8) questions about Detective Zaragoza's later admission that his prior testimony was mistaken.

11

B.  Trial court's preliminary determination that no *Perkins* operation occurred

We agree with the People that the trial court did not err in finding that there was no evidence of a *Perkins* operation with Serrano.

"Sometimes the relevance of evidence depends on the existence of a preliminary fact.  [Citations.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 466; Evid. Code, § 403, subd. (a).)  A trial court's role in deciding a preliminary fact question is merely to determine whether there is evidence sufficient to permit a jury to decide the question.  (*People v. Brooks* (2017) 3 Cal.5th 1, 47; *Lucas*, *supra*, 12 Cal.4th at p. 467; *People v. Cottone* (2013) 57 Cal.4th 269, 284 [trial court performs a threshold screening function to shield jury from evidence so factually weak as to undermine its relevance].)  We review a court's finding whether the foundational evidence is sufficiently substantial for abuse of discretion.  (*People v. Ng* (2022) 13 Cal.5th 448, 548; *Lucas*, *supra*, 12 Cal.4th at p. 466.)

Here, the court acted well within its discretion when it made a preliminary factual determination that there was insufficient evidence of a *Perkins* operation to give the issue to the jury.  The detectives' testimonies at the preliminary hearings were the primary evidence of an actual *Perkins* operation with Serrano.  The evidence also included a "Chrono" indicating that the *Perkins* operation with Serrano had been set for a certain date.  But the detectives later testified at the September 2022 hearing that no operation had occurred and that they had confused Serrano with a woman in another case in which they did conduct a *Perkins* operation.  Defendant could have introduced evidence at that September 2022 hearing to show that a *Perkins* operation actually had occurred, or to show that the detectives

12

lied when they testified their preliminary hearing testimonies were mistaken. But defendant did not do so.

Similarly, prior to making its preliminary factual determination, the court asked counsel to make an offer of proof that a *Perkins* operation had been conducted. Counsel made arguments that a *Perkins* operation had actually taken place, but did not identify any evidence she could introduce to prove it. Based on the foregoing, the court reasonably concluded that there was insufficient factual foundation to permit counsel to ask the detectives whether a *Perkins* operation had actually been conducted.

Defendant asserts that there was sufficient factual foundation that a *Perkins* operation with Serrano actually had been conducted, citing (1) Detective McCoy's preliminary hearing testimony providing details about such an operation, (2) the fact that Detective McCoy, who was present at the August 2021 preliminary hearing in which Detective Zaragoza testified, did not attempt to correct his colleague's testimony, and (3) the "Chrono" indicating that a *Perkins* operation had been scheduled, but no notation that the operation had not been conducted. But this evidence does not establish that the trial court abused its discretion.[10] Rather, in light of the detectives' testimonies regarding their confusion of Serrano with Zambrano, the trial

---

[10] The judge at the initial trial stated that the defense had a reason to believe that a *Perkins* operation with Serrano had actually happened, pointing out that both detectives had testified at preliminary hearings that it had happened and that Detective McCoy gave details about the operation. But at most this shows different judges could have a difference of opinion about whether there was enough evidence to establish the preliminary fact that the operation actually happened, not that the court at the retrial abused its discretion.

13

court's ruling was not arbitrary, capricious, or patently absurd. (*People v. Miralrio* (2008) 167 Cal.App.4th 448, 459 ["[That there might be a basis for the trial court to reach a different conclusion does not render the court's decision an abuse of discretion"].) And, it was reasonable for the trial court to conclude that even though the "Chrono" included an entry indicating a *Perkins* operation had been scheduled, that entry did not establish that it had actually been conducted.

In making this ruling, the trial court did not improperly shift the burden to the defense to prove a *Perkins* operation actually had been conducted. The "proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact." (Evid. Code, § 403, subd. (a)(1).) Defendant was the one seeking to introduce evidence that a *Perkins* operation actually had been conducted; thus, it was his burden to prove that preliminary fact. He did not do so. He did not, for example, call Serrano to testify about who she spoke to while in jail. He also did not ask for a hearing pursuant to Evidence Code section 402.[11] And there is no showing that the prosecution failed to meet its discovery obligations. Since there was no *Perkins* operation, there was nothing to disclose.

Even if the question of whether a *Perkins* operation had actually been conducted was sufficient to be submitted to the jury, defendant still had to prove that such evidence was relevant. (*People v. Fuiava* (2012) 53 Cal.4th 622, 664 (*Fuiava*) [mere existence of lawsuit, without proof of the truth of the allegations raised in it, would not have been relevant to prove deputy sheriff's propensity or motive to unlawfully use force]; *People v. Rundle* (2008) 43 Cal.4th 76, 132–133, overruled in part

---

[11]	Defense counsel did request such a hearing in the first trial.

on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [trial court did not abuse its discretion by excluding evidence when the defendant failed to establish preliminary fact of correlation between the proffered evidence and the inference to be drawn from it].) He failed to do so. Defendant has not explained how a jury determination as to whether a *Perkins* operation with Serrano took place could be relevant to the murder charge leveled against him.

During the proceedings below, defense counsel argued that evidence of the *Perkins* operation was relevant to the credibility of the detectives, because it showed that the detectives lied at the September 2022 hearing when they testified that there was no *Perkins* operation. But, as set forth below, the detectives' credibility was a collateral issue in this case; the key issue was identity, and their credibility had little, if any, bearing on that issue.

C. Detectives' prior inconsistent testimonies

1. *Relevant law*

Only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is evidence having "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; see also *People v. Morrison* (2004) 34 Cal.4th 698, 711.) Relevant evidence includes "evidence 'relevant to the credibility of a witness.' [Citations.]" (*People v. Contreras* (2013) 58 Cal.4th 123, 152; see also Evid. Code, § 780.)

"Conversely, a matter is 'collateral' if it has no logical bearing on any material, disputed issue. [Citation.] A fact may bear on the credibility of a witness and still be collateral to the case. [Citations.]" (*People v. Contreras, supra,* 58 Cal.4th at p. 152; see also *People v. Tuggles* (2009) 179 Cal.App.4th 339, 361.)

15

"Of course, the trial court has wide latitude under state law to exclude evidence offered for impeachment that is collateral and has no relevance to the action. [Citations.] This exercise of discretion necessarily encompasses a determination that the probative value of such evidence is 'substantially outweighed' by its prejudicial, 'confusing,' or time-consuming nature." (*People v. Contreras*, *supra*, 58 Cal.4th at p. 152, citing Evid. Code, § 352.) "[A]s long as the excluded evidence would not have produced a ""significant different impression"" of the witness's credibility, the confrontation clause and related constitutional guarantees do not limit the trial court's discretion in this regard. [Citations.]" (*People v. Contreras*, *supra*, at p. 152.)

We review a trial court's ruling on the admissibility of evidence, including its determinations regarding the probative value and prejudice of evidence under Evidence Code section 352, for abuse of discretion. (*People v. Cox* (2003) 30 Cal.4th 916, 955, overruled in part on other grounds in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22; *People v. Waidla* (2000) 22 Cal.4th 690, 724.) Discretion is abused only where there is a showing that it was exercised in "'an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125; *People v. Martinez* (1998) 62 Cal.App.4th 1454, 1459.)

To the extent we consider whether defendant's constitutional rights were violated, we review the trial court's order de novo. (*People v. Castaneda-Prado* (2023) 94 Cal.App.5th 1260, 1283.)

2. *Analysis*

Applying these legal principles, we conclude that the trial court acted well within its discretion in excluding the detectives' preliminary hearing testimonies (1) that they conducted a

16

*Perkins* operation with Serrano and their later testimonies at the September 2022 hearing that their testimonies at the preliminary hearings were mistaken, (2) that no operation actually had been conducted, and (3) that they had confused Serrano with another woman with whom they had conducted a *Perkins* operation. The court also reasonably barred the defense from asking the detectives whether a *Perkins* operation actually had been conducted in order to impeach the detectives.

As defendant acknowledges on appeal, the central issue in the retrial was the identity of the person who shot and killed Castle. During closing argument, the prosecutor asserted that the key disputed issue was "who was the shooter." Similarly, defense counsel argued that defendant was not the shooter. The detectives' credibility was a collateral issue because it had little, if any, logical bearing on the key disputed issue of identity.

For example, the detectives' credibility had no bearing on: (1) the accuracy of what was depicted on the surveillance videos; (2) whether the hat and clothing recovered from defendant's home were those worn by the shooter shown on the video and the person with Serrano at the crime scene on the day prior to the murder; (3) whether the man shown on video exiting the Mercedes had tattoos similar to those of defendant; (4) the accuracy of the cell phone mapping evidence, texts, and calls that showed Bracamontes, Serrano, and defendant in the area of the crime scene at the time of the shooting; (5) the accuracy of the ballistics evidence and defendant's text seeking to replace his gun; and (6) on evidence relating to defendant's internet search for news about a shooting in the area of the crime scene.

Defendant does not explain how the detectives' credibility had any relevance in contesting any of the evidence discussed above showing that defendant was the shooter. Rather, on appeal, he asserts that Detective Zaragoza's credibility was

17

relevant because he testified at trial that he heard defendant use the word "'bustin,'" meaning shooting a gun, instead of the word "'busted,'" on the recorded jail call between defendant and Serrano.  But the jury could listen to the recorded call and decide for themselves what word defendant said during that call, rendering Detective Zaragoza's credibility as to that point unimportant.  The jury was also instructed that they alone were to decide what the facts were, further lessening any importance of Detective Zaragoza's testimony regarding what he heard on the recording.

Furthermore, because Detective McCoy did not testify at the retrial, his credibility was not at issue.

Since the detectives' credibility was a collateral issue, the court acted well within its broad discretion to exclude their prior inconsistent testimony regarding whether a *Perkins* operation had occurred with Serrano.  (Evid. Code, § 352; *People v Contreras*, *supra*, 58 Cal.4th at p. 153 [trial court did not abuse its discretion in excluding impeachment evidence where no substantive inference about the defendant's guilt of the charged crime could be drawn from it]; *People v. Sanders* (2010) 189 Cal.App.4th 543, 556 [noting that a nonparty witness's credibility may be a collateral matter].)

3. *No constitutional error*

For the same reasons, we reject defendant's contention that the exclusion of this evidence violated defendant's constitutional rights.[12]  As set forth above, the primary issue in this case was the identity of the shooter, and there was ample evidence that defendant was that shooter.  Detectives Zaragoza and McCoy's inconsistent testimonies about a *Perkins* operation with Serrano

---

[12]     We do not consider defendant's purported evidence of "[s]tudies" that support his contention that prohibiting impeachment evidence violated his constitutional rights.

18

had no bearing on this issue.  On appeal, defendant contends:  "If the jury concluded there was a *Perkins* operation, and that Serrano did not make any incriminating statements, it would have undermined the prosecution's theory that appellant was the assailant."  That argument simply makes no sense.

### 4. *Harmless error*

For the sake of completeness, we note that even if the trial court had erred in excluding any evidence on the purported *Perkins* operation with Serrano, any such error would be harmless as a matter of law.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  At the risk of sounding redundant, given the abundant evidence of defendant's guilt, allowing evidence of the detectives' inconsistent testimonies would not have resulted in a more favorable verdict.

## II. *Alleged prosecutorial misconduct in first trial*

Defendant contends that the prosecutor's act during the initial trial of changing a critical word (from "'busted'" to "'bustin'") in the transcript of a recording of one of his jail calls and attempting to pass it off as the original transcript constituted prosecutorial misconduct and/or outrageous governmental conduct warranting dismissal of the case.

### A. <u>Relevant proceedings</u>

#### 1. *Initial trial*

Defendant was arrested on December 5, 2020.  On January 8, 2021, he made a call from jail to Serrano, which was recorded.  On May 17, 2022, Matthew Williams (Williams) transcribed that call.  According to that transcription, defendant said:  "Remember when I was *busted* and your brother damn near run me over."  (Italics added.)

The first trial began on November 3, 2022.  During that trial, on November 28, or 29, the prosecutor gave defense counsel a new transcript of the January 8 recorded call.  Even though the

19

transcript had the same May 2022 declaration from Williams, this transcript was not identical to the prior one. Specifically, the transcript now indicated that defendant said: "Remember when I was *bustin'* and your brother damn near run me over." (Italics added.)

At a hearing on Evidence Code section 402 motions, defense counsel argued that a transcript of a jail call between defendant and Serrano had been altered. She argued that the prosecutor was attempting to pass off the new transcript as if it were the same document as the original transcript.

The court stated: "I understand your concern, but this transcript is not going to be an exhibit. It will be marked, but the jury will not have it in the jury room. And I will fully instruct the jury that it is what they hear on the recording, and you are free to play back that portion and argue that the transcript is not correct." The court also indicated that it would remove the declaration/certification from the altered transcript.

Defense counsel then requested that the jury only be presented with the original transcript that was "not somehow manipulated to fit the prosecution's case." The court denied that request, reiterating that the transcript was not evidence and finding that "[t]here was no manipulation of any evidence." The court also ruled that when the recording was played, the original transcript could be marked as a defense exhibit.

Later, when defense counsel revisited the issue, the court stated that it would (1) permit the prosecution to use whatever transcript it decided to present; (2) instruct the jury about the discrepancy about the specific word used; (3) instruct the jury that the transcript was not evidence; and (4) urge the jury to listen carefully to the recording. The court also ruled that defense counsel could "submit whatever transcript you have," including the original transcript.

20

During Detective Zaragoza's testimony, both parties presented transcripts of the relevant jail call. Before the recording was played, the court instructed the jury that a transcript was an aid, and that during deliberations, the jury would not have either the prosecution or defense transcript, but the jury could listen to the actual recording. The court also informed the jury the parties disputed whether defendant used the word "busted" or "busting."

Detective Zaragoza testified that he heard defendant use the word "'bustin," which was significant because "[i]n [his] near 15 years of being a police officer," the words "'busted'" and "'bustin'" mean "shooting." "So for to someone to say I'm bustin, I'm shooting, I was bustin, I was shooting I was—I busted—past tense for I fired a shot."

In closing argument, the prosecutor referred to the recorded call and asserted that defendant said "'bustin.'" But he also argued that it was up to the jury to decide whether defendant said "'bustin'" or "'busted,'" and, in either case, defendant's conversation with Serrano established that they were talking about the shooting. In her closing, defense counsel argued that the prosecution changed the word in its transcript to manipulate the jury.

In December 2022, the trial court declared a mistrial due to juror deadlock. Defense counsel filed a motion to dismiss, arguing, in relevant part, that the prosecutor engaged in "potential misconduct" by altering a key word in the transcript of the jail call and attempting to present that transcript as if it was the original transcript.

On January 13, 2023, the trial court denied the motion to dismiss, finding that the issue had already been litigated—it had already found no misconduct. The court also found that defendant's trial had been fair, reasoning that it had given an

21

adequate remedy regarding the altered transcript, including instructing the jurors that they were to decide what was said on the recording, not the transcript.

### 2. *Retrial*

Defense counsel raised the issue again at the retrial. After discussion with the parties, the court decided that either party could provide their own transcript of the recording. Furthermore, the court would instruct the jury that the evidence was what they heard on the recording, not what was written on a transcript, which was a guide that they could use. Also, the attorneys could argue to the jury what was actually on the recording. The jury would listen to the recording and make their own determination what was said.

A recording of the relevant jail call between defendant and Serrano was played at the retrial. In closing argument, defense counsel argued that the transcript of the call provided by the prosecutor used the word "'bustin'" because the prosecutor wanted the jury to believe that defendant was talking about a shooting. But if the jury listened to the recording, they would hear that defendant actually used the word "'busted,'" which meant that he had been caught. Defense counsel argued the prosecution was trying to spin the facts to fit its theory of the case.

### B. Relevant law

### 1. *Prosecutorial misconduct*

"Prosecutorial error 'occurs, as a matter of state law, when a prosecutor "engage[s] in deceptive or reprehensible tactics in order to persuade the trier of fact to convict." [Citation.]'" (*People v. Doane* (2021) 66 Cal.App.5th 965, 976; see also *People v. Parson* (2008) 44 Cal.4th 332, 359 ["Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial

22

[Citation.]"].)  Reversible misconduct occurs if "it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted.  [Citation.]" (*Fuiava, supra,* 53 Cal.4th at p. 679.)

Federal constitutional error occurs only when the prosecutor's actions "'"'comprise a pattern of conduct that is serious and egregious, such that the trial is rendered so unfair that the resulting conviction violates the defendant's right to due process of law.'"  [Citation.]" (*People v. Doane, supra,* 66 Cal.App.5th at p. 976.)  In other words, "'conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  [Citation.]'  [Citation.]" (*Fuiava, supra,* 53 Cal.4th at p. 679; *People v. Samayoa* (1997) 15 Cal.4th 795, 841; *People v. Farnam* (2002) 28 Cal.4th 107, 167.)

We review the trial court's rulings on prosecutorial misconduct for abuse of discretion.  (*People v. Ramirez* (2022) 13 Cal.5th 997, 1122.)

### 2.  *Outrageous government conduct*

"A court's power to dismiss a criminal case for outrageous government conduct arises from the due process clause of the United States Constitution.  [Citation.]" (*People v. Guillen* (2014) 227 Cal.App.4th 934, 1002 (*Guillen*).)  "Outrageous government conduct is conduct that "'shocks the conscience'" or is "'"shocking to the universal sense of justice.'"'" (*Id.* at p. 1003.)  "Ninth Circuit Court of Appeals' cases have described what a high bar defendants who assert outrageous government conduct must

23

overcome. The remedy is a 'narrow one.' [Citation.]" (*Id.* at p. 1004.)

Courts have found outrageous governmental conduct where the state has violated a defendant's bodily integrity (*Rochin v. California* (1952) 342 U.S. 165, 172), entrapped a defendant into committing crimes (*Guillen, supra,* 227 Cal.App.4th at pp. 1003–1007 [citing state and federal cases in entrapment context]), or intentionally interfered with a defendant's right to counsel (*People v. Velasco-Palacios* (2015) 235 Cal.App.4th 439, 447–449 (*Velasco-Palacios*)).

C. <u>Analysis</u>[13]

1. *No prosecutorial misconduct or outrageous government conduct*

We agree with the People that the initial trial court acted well within its discretion in finding that there was no prosecutorial misconduct or outrageous government conduct due to the change of the word "busted" to "bustin" in the transcript of the jail call. We do not adopt defendant's characterization of the prosecutor's conduct as manipulation of evidence, as dishonest, or as an attempt to use false evidence. As the trial court expressly noted, the transcript itself was not evidence and was not going to be submitted to the jury as an exhibit. Furthermore, the jury was instructed that the evidence was what they heard on the recording of the call, not the transcript. And there is no evidence that the recording was changed in any way.

Urging us to reverse, defendant points to Detective Zaragoza's testimony that he heard the word "bustin," which is important because defendant's use of the word "bustin" was

---

[13] The People argue that this claim was forfeited for failing to object timely and properly below. We are not convinced and reach the merits of defendant's argument.

24

"tantamount to an admission that he was the assailant." The problem for defendant is that Detective Zaragoza's testimony was not so clear. He actually testified that both words—"busted" and "bustin"—mean shooting. Thus, regardless of which word was on the transcript, the import was the same.

At the initial trial, defense counsel claimed that not only was a key word of the transcript changed, but the prosecutor also acted dishonestly by trying to "pass off" the changed transcript as the original by keeping the initial transcriber's declaration with the changed transcript. Regardless of whether the prosecutor was trying to present the altered transcript as the original, that did not constitute prosecutorial misconduct or outrageous governmental conduct. As set forth above, the transcript itself was not evidence and there was no attempt to manipulate the recording.

2. *Alleged constitutional violations*

Assuming without deciding that there was prosecutorial misconduct or outrageous government conduct, that conduct did not violate defendant's constitutional rights. There is no likelihood that the People's transcript[14] improperly influenced the jury.

As set forth above, the trial court gave both transcripts to the jury as "an aid" during the trial. Furthermore, the jury was instructed that it would not have either transcript during deliberations; rather, it would "have the actual audio recording" and it would decide what it heard. We presume that the jury followed these instructions (*People v. Smith* (2007) 40 Cal.4th 483, 517–518; *People v. Holt* (1997) 15 Cal.4th 619, 662) and

---

[14]    We reiterate that defendant was permitted to present his own transcript and to argue that the recording showed that defendant used the word "busted," not "bustin."

25

decided the facts of the case based on what defendant actually said on the recording, not any transcript.

Defendant's right to counsel was also not violated for the simple reason that he fails to offer any argument explaining how the People's transcript impacted his right to counsel. (Compare *Velasco-Palacios*, *supra*, 235 Cal.App.4th at pp. 447–449 [prosecutor's use of fraudulent transcript with purported confession of defendant violated right to counsel by causing counsel to withdraw, depriving appellant of his right to retain his attorney of choice; even if counsel did not withdraw, the use of the fraudulent evidence "inflicted irreparable damage" by causing defendant to distrust counsel].) Absent any explanation or analysis setting forth a violation of the right to counsel, the claim is meritless. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1107, fn. 37 (*Barnett*) ["As this contention is perfunctorily asserted without any analysis or argument in support, we reject it as not properly raised"].)

### 3. *Harmless error*

Assuming without deciding that the initial trial court erred, under either *Chapman v. California* (1967) 386 U.S. 18, 24 or *People v. Watson*, *supra*, 46 Cal.2d at page 836, any error in allowing the prosecution to rely upon the alteration of the transcript was harmless. (*People v. Houston* (2012) 54 Cal.4th 1186, 1223; *People v. Fernandez* (2013) 216 Cal.App.4th 540, 564.) Aside from the fact that the evidence of defendant's guilt was overwhelming, as set forth above, the jury was instructed that the recording was the evidence, that the transcript was a guide, and that they were to decide the facts of the case.[15]

---

[15] Not to mention the fact that the first trial resulted in a mistrial.

26

4. *Alleged failure to exclude evidence*

Finally, defendant contends in the alternative that the trial court's failure to "exclude the evidence" warrants reversal. But he does not specify what evidence should have been excluded, or provide any law, argument, or analysis regarding exclusion of evidence. We reject this one-sentence argument. (*Barnett*, *supra*, 17 Cal.4th at p. 1107, fn. 37.)

III. *Admission of evidence that a gun was recovered from the property where defendant lived*

Defendant contends that the trial court erroneously admitted evidence that a .45 caliber firearm, loaded with .45 caliber ammunition, was recovered from the converted garage at the property where he lived because that firearm was not the murder weapon. He claims that the evidence was irrelevant and constituted propensity or bad character evidence, and its admission violated his state and federal constitutional rights to due process.

A. Relevant proceedings

1. *Pretrial proceedings (nine-millimeter ammunition admissible)*

In his trial brief, the prosecutor noted that during the December 5, 2020, search of defendant's home, the Torrance Police Department recovered a "firearm and ammunition" (namely a .45 caliber handgun and .45 caliber ammunition from a bag in the converted garage's living room, as well as nine-millimeter ammunition) from a dresser drawer in one of the converted garage's bedrooms.

At an Evidence Code section 402 hearing, over defense counsel's objection, the court found the nine-millimeter ammunition[16] admissible. After all, there was evidence that

---

[16]     At trial, the prosecution presented evidence that all of the bullets recovered from the dresser drawer were nine-millimeter.

27

defendant had access to the converted garage even though he lived in the main house. And a nine-millimeter gun recovered from Serrano (also admitted into evidence) had turned out to be the murder weapon.

      2. *Trial proceedings and rulings (.45 caliber gun and ammunition admissible)*

During direct examination of Torrance Police Department Detective Mark Hassoldt, the prosecution presented evidence of the nine-millimeter bullets found in a dresser in the converted garage on the property where defendant lived.

Thereafter, the prosecutor intended to offer into evidence a photograph of the .45 caliber gun. Defense counsel objected on the grounds that evidence of a gun other than the murder weapon was irrelevant and improperly inflamed the passions of the jury. The trial court overruled the objections and admitted evidence of the .45 caliber gun.[17]

In closing argument, the prosecutor did not refer to the .45 caliber gun. Instead, he argued that the nine-millimeter gun recovered from Serrano was the murder weapon. He also noted that nine-millimeter ammunition was recovered from the converted garage, and some of those rounds were the same brand of ammunition used in the murder.

---

One of the loose bullets was the same brand as the casings recovered from the crime scene and bullets from the gun recovered from Serrano, which was the murder weapon.

[17] At the close of trial, in discussing the admissibility of exhibits, defense counsel again objected to the admission of the photograph of the .45 caliber gun. The trial court again overruled the objection, noting that it had already addressed the admissibility of the gun.

In defense counsel's closing argument, she argued inter alia that the converted garage (where Tiffany lived) and the house (where defendant lived) were separate.

During rebuttal, the prosecutor did not refer to the .45 caliber gun or .45 caliber ammunition.

B. <u>Relevant law</u>

The rules regarding the admissibility of relevant evidence are set forth above. (See, e.g., Evid. Code, §§ 210, 350, 352.) We review the trial court's rulings on the admission of evidence, including evidence admitted under Evidence Code section 352, for abuse of discretion. (*People v. Thompson* (2016) 1 Cal.5th 1043, 1120; *People v. Holford* (2012) 203 Cal.App.4th 155, 167.) The erroneous admission of evidence is harmless if it is not reasonably probable that the appellant would have obtained a more favorable result had it been excluded. (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1018–1019; *People v. Jordan* (2003) 108 Cal.App.4th 349, 366.) It must be shown that the erroneous admission of evidence led to a miscarriage of justice. (Evid. Code, § 353, subd. (b).)

C. <u>Analysis</u>

Assuming without deciding that the trial court erred in admitting evidence of the .45 caliber gun and ammunition, that alleged error would have been harmless as a matter of law. In light of the overwhelming evidence of defendant's guilt, it is not reasonably probable that defendant would have obtained a more favorable verdict had this evidence not been admitted.

Urging us to conclude otherwise, defendant asserts that the .45 caliber gun and .45 caliber ammunition constituted inadmissible propensity evidence.

Courts have held that evidence that a defendant possessed weapons not used in the commission of a charged offense is inadmissible where its only relevance is to show that the

29

defendant is the type of person who surrounds himself with weapons. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056; *People v. Riser* (1956) 47 Cal.2d 566, 577, overruled in part on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 649; *People v. Henderson* (1976) 58 Cal.App.3d 349, 360.)

Here, neither party presented evidence regarding who owned the .45 caliber gun, so there was no direct evidence that defendant owned it. Also, neither party argued to the jury that the gun belonged to defendant. Indeed, in closing argument, defense counsel argued that the gun belonged to Tiffany.

In fact, there was evidence that the .45 caliber gun did not belong to defendant. At trial, the prosecution presented evidence of defendant's text messages in late November 2020 in which he stated that he lost his gun, he needed to buy another gun, and asked for help to buy one. That defendant lost his gun and was looking to buy one in November 2020 is evidence that he did not own the subject .45 caliber gun. After all, if defendant owned the .45 caliber gun, there was no need for him to try to purchase another one.

Since there was no evidence that defendant owned the .45 caliber gun, the jury could not have concluded that it was evidence of his propensity to own weapons.

IV. *Alleged prosecutorial misconduct in the retrial*

Defendant contends that the prosecutor engaged in a pattern of misconduct, specifying three instances: (1) the prosecutor altered the transcript of a recorded jail call between defendant and Serrano, changing the word "busted" to "bustin"; (2) the prosecutor violated trial court rulings excluding gang evidence; and (3) the prosecutor submitted copies of exhibits containing evidence that had not actually been admitted at trial.

A. Relevant law

As set forth above, a prosecutor's use of deceptive or reprehensible methods to persuade the court or jury constitutes misconduct under California law, and a prosecutor's conduct violates the federal Constitution if it so infected the trial with unfairness as to deny due process. (*Fuiava, supra*, 53 Cal.4th at p. 679.) We review a trial court's prosecutorial misconduct rulings for abuse of discretion. (*People v. Ramirez, supra*, 13 Cal.5th at p. 1122.)

"[A] number of instances of prosecutorial misconduct may act synergistically to create an atmosphere of prejudice more intense than the sum of its parts." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1349–1350; *People v. Hill* (1998) 17 Cal.4th 800, 823–829 [detailing the misconduct], 845, 847 [noting "[t]he sheer number of the instances of prosecutorial misconduct"].)

B. Analysis

1. *Alleged alteration of transcript*

Regarding defendant's allegation that the prosecutor altered the transcript of a recorded jail call between defendant and Serrano, for the reasons set forth above, this claim lacks merit. And, by the time of the retrial, there was no issue concerning the prosecutor's attempt to "pass off" an altered transcript as the original.

2. *Alleged violation of rulings excluding gang evidence*

a. Relevant proceedings

Prior to trial, the court granted defendant's motion to exclude any evidence of defendant's gang membership.

On February 15, 2023, before the trial court preinstructed the jury and before any evidence was presented, defense counsel asked that the prosecutor advise Officer Byun to not mention anything about gangs, noting that he had done so at the first

trial.  The court declined to do so, but pointed out its ruling excluding gang evidence had been very clear.

During the prosecutor's direct examination of Officer Byun, the following colloquy took place:

"Q.  Can you tell us your current occupation and assignment?

"A.  I'm currently assigned –

"Q.  Wait.  Let me stop you there.  [¶]  Do you work for L.A.P.D.?

"A.  Yes, sir.

"Q.  And do you work patrol for L.A.P.D.?

"A.  No.  I'm currently assigned to Southeast gang enforcement detail."

Defense counsel objected and made a "motion to limit."  The court overruled the objection, but directed Officer Byun to listen to the question, and give a yes-or-no answer if that was what question called for.  After a few questions, the prosecutor asked Officer Byun to explain his duties in responding to 911 calls.  Officer Byun responded, "My duties as a police officer is responding to any type of radio calls.  It could be gang-related.  It could be murders, robberies."  Defense counsel objected and asked for a sidebar; the trial court declined the request.

Subsequently, the trial court discussed Officer Byun's testimony with the parties.  The court told the prosecutor that he had a duty to talk to his witnesses about its evidentiary rulings so as to keep them from testifying about inadmissible matters.  The prosecutor responded that before putting Officer Byun on the stand, he told Officer Byun not to mention gangs.  The court ruled that if the jury asked for readback of Officer Byun's testimony, it would strike Officer Byun's answers pertaining to gangs.

Defense counsel moved for a mistrial, which the trial court denied.

### b. Forfeiture

Preliminarily, we agree with the People that defendant forfeited this claim of prosecutorial misconduct by failing to object on grounds of prosecutorial misconduct and requesting an admonition. (*Fuiava*, *supra*, 53 Cal.4th at pp. 679–681; *People v. Peoples* (2016) 62 Cal.4th 718, 797.) In response to Officer Byun's references to working in a gang detail and the radio calls that he responded to could be gang-related, counsel objected, but did not specify that she was doing so on grounds of prosecutorial misconduct. While she made a motion for a mistrial, she did not specify prosecutorial misconduct as the basis for that motion. And there is no evidence that a timely objection would have been futile. (*Ibid.*) Under these circumstances, defendant has forfeited this objection on appeal.

### c. Analysis

In any event, on the merits, defendant's claim fails. Though Officer Byun made two brief references to gangs, the record shows that he did so of his own accord despite the prosecutor's efforts to keep him from doing so.[18] Before Officer Byun testified, the prosecutor told Officer Byun not to discuss gangs. When Officer Byun was about to mention that he worked in a gang detail, the prosecutor stopped Officer Byun and specifically asked if he worked patrol, suggesting that the prosecutor was trying to guide Officer Byun away from specifying that he worked in a gang detail.

---

[18] It follows that we reject any suggestion that the prosecutor intentionally elicited inadmissible testimony. (*People v. Parker* (2022) 13 Cal.5th 1, 77; *Fuiava*, *supra*, 53 Cal.4th at p. 679.)

Even if we assumed that the prosecutor's conduct as to Officer Byun's testimony was somehow improper (which it was not), nothing about that conduct was deceptive, reprehensible, or a violation of due process. (See, e.g., *People v. Navarro* (2021) 12 Cal.5th 285, 336 [though prosecutor's question was "likely improper," it was neither deceptive nor reprehensible, nor did it infect the trial with unfairness].) His questions were foundational, i.e., asking about Officer Byun's job responsibilities, and Officer Byun made only two brief references to how gangs related to his work. This testimony "undoubtedly had no effect on the jury's verdict." (*Ibid.*)

Finally, there was no reasonable likelihood that the jury understood Officer Byun's testimony to mean, as defendant asserts, that the shooting in this case was gang-related.[19] Officer Byun's testimony described his role in responding to the crime. He did not offer any specific testimony about gangs, i.e., he did not testify that the crime scene was in the area of a particular gang, or that defendant or Castle was a gang member. Moreover, Officer Byun's references to gangs were limited to stating that he was "currently assigned" to a gang detail. Given that the instant offense occurred years earlier, there is no reason that the jury would have necessarily concluded that Officer Byun was working in the same capacity at the time that defendant committed the instant offense.

   3. *Submission of CDs containing jail calls of Serrano, Bracamontes, and defendant that had not been admitted at trial*
         a. Relevant proceedings
During the first day of presenting witnesses at the retrial, the prosecutor indicated that the People's exhibit No. 1A was an eight-gigabyte flash drive containing numerous files. The court

_____

[19]    It follows that defendant was not prejudiced by Officer Byun's testimony.

instructed the prosecutor that each exhibit had to be placed on a separate CD. After the prosecutor completed presenting his case-in-chief, the court reiterated that both parties had to "put on a separate CD for every separate exhibit."

After jury deliberations began, the jurors were given a laptop so that they could view some of the exhibits. Following a discussion about the jury's request for People's exhibit Nos. 48 and 49, the court stated that it would tell the jurors that People's exhibit Nos. 48 and 49 were lists of jail calls introduced for limited purpose of showing numbers called by Serrano and Bracamontes, but "there was no jail call audio introduced" on them.

Exhibits, including People's exhibit Nos. 48 and 49, were provided to the jury, along with a "clean" laptop.

Later that day, when the prosecutor was not in court, he received a text from defense counsel indicating that the court's judicial assistant wanted to ensure that there was no audio on People's exhibit Nos. 48 and 49. The prosecutor responded that there was audio of the jail calls on those exhibits.

Despite the trial court's statement that exhibit Nos. 48 and 49 were only a list of the jail calls between Bracamontes and Serrano (no audio), it turned out, as the prosecutor had told defense counsel, that those exhibits did contain audio of the jail calls. According to defense counsel, the court's judicial assistant "caught that issue." Thus, as a precaution, those exhibits had been pulled from the jury room.

The court then reiterated to the prosecutor: "You need to provide not all the files on one CD. This is the reason we do this [require each exhibit to be submitted on a separate CD]." The court asked the prosecutor what other exhibits might contain unadmitted evidence. The prosecutor replied that People's exhibit No. 46A might contain all of defendant's jail calls, not just

35

the three calls admitted at trial.  The court directed the judicial assistant to pull People's exhibit No. 46A from the jury room and explain to the jurors that the court needed to check something.

Thereafter, the court used a computer to review People's exhibit No. 46A in chambers with the parties and determined that it contained recordings of all of defendant's jail calls.  It told the prosecutor that he had failed to comply with the prior rulings to submit each exhibit on a separate CD.  The court ruled it was going to "pull all the CD's" and that going forward, whenever the jury requested to view or hear an exhibit, the court and parties would review it in open court.  Finally, the court noted that when the judicial assistant pulled People's exhibit No. 46A, the jurors reported that they had not yet looked at it.  The laptop available in the jury room could not play People's exhibit No. 46A due to software and formatting issues.

Defense counsel argued that the prosecutor had committed misconduct by knowingly submitting exhibits to the jury that contained unadmitted evidence.  Counsel also argued that the prosecutor had violated his duty of candor by not specifying that People's exhibit Nos. 48 and 49 contained not only lists but also the actual audio of the jail calls of Serrano and Bracamontes.  Counsel asserted that this misconduct warranted a mistrial.

The court denied defendant's motion, finding that the prosecutor did not attempt to commit any type of fraud on defense counsel or the court.  Rather, his inclusion of unadmitted evidence on some of the exhibits was the result of "disorganization."  The court further found no prejudice as a result of the prosecutor's error "because as we know, the jury has not had an opportunity, even if they wanted to or tried to, they couldn't look at any CD's based on the formatting on the laptop that was provided to them."

After the jury reached its verdict, the prosecution filed a "Final Exhibit List." The prosecutor summarized the proceedings concerning People's exhibit Nos. 48 and 49 (the jail calls of Serrano and Bracamontes) and 46A (defendant's jail calls), noting that those exhibits included evidence not admitted at trial. The prosecutor conducted further review and believed that additional exhibits that he had submitted included evidence not admitted at trial, specifying People's exhibit No. 46A and Facebook and Instagram records for Serrano and Bracamontes. The prosecutor asserted that the jury did not view any of these exhibits because all of the CDs had been pulled from the jury room, the jury did not request Serrano and Bracamontes's social media records, and the laptop provided to the jurors could not play the CDs.

The prosecutor also reviewed the laptop given to the jurors and searched for recent files opened on it. Based on that review, the jury viewed two files related to a video of the December 5, 2020, search of defendant's home. That review also showed that the files containing the jail calls had been "accessed or clicked on," but "the software on the computer [did] not allow the computer to play those files."

Finally, the prosecutor provided information showing that he had four other pressing cases at the time of jury deliberations in this case.

### b. No prosecutorial misconduct

The trial court did not err in finding no prosecutorial misconduct. The prosecution's case included voluminous exhibits; as such, the trial court did not abuse its discretion in finding that the prosecutor's inadvertent inclusion of unadmitted evidence was the result of his disorganization and lack of careful review.

Further, in response to defense counsel's text that the court's judicial assistant wanted to ensure there was no audio on

People's exhibit Nos. 48 and 49, the prosecutor admitted that those exhibits included the audio of the calls. When asked if any other exhibits might include evidence not admitted at trial, the prosecutor responded that People's exhibit No. 46A might include all of defendant's jail calls, not just the three that had been admitted at trial. Based on these responses, we can reasonably infer that the prosecutor was not acting deceptively or in a reprehensible manner, but out of carelessness. And any such carelessness did not so infect the trial with unfairness as to violate due process. (See *People v. Navarro*, *supra*, 12 Cal.5th at p. 336.)

c. No prejudice

We further conclude that the trial court did not err in finding no prejudice. People's exhibit Nos. 48 and 49 were pulled from the jury room, and there is no evidence or argument that the jury actually listened to these calls; indeed, defense counsel stated that "luckily the J.A. [judicial assistant] caught that issue." And, the judicial assistant told the trial judge that the jurors had reported that they did not listen to exhibit No. 46A.

In fact, the jury was unable to listen to People's exhibit Nos. 46A, 48, or 49. The laptop that had been provided to the jurors was unable to play any of the CDs due to formatting and software issues. Since the jury did not and could not have heard any of the unadmitted jail call recordings included in People's exhibit Nos. 46A, 48, or 49, defendant certainly could not have been prejudiced by the error in providing those calls to the jury.[20] (See, e.g., *Seumanu, supra*, 61 Cal.4th at p. 1350 [even considering claims of judicial and prosecutorial misconduct together, there was no cumulative prejudice].)

---

[20] Given that the jury did not listen to the subject recordings, we reject defendant's assertion that prejudice must be presumed here.

38

V. *Denial of defendant's petition for release of juror identifying information and allowing the jury to leave via private elevator*

Defendant contends that the trial court abused its discretion and violated his right to due process by preventing defense counsel from speaking to the jurors after the verdict.

A. <u>Relevant proceedings</u>

After the jury reached its verdict, defense counsel filed a petition for access to personal juror identifying information. In counsel's supporting declaration, she declared that after the jury's verdict was read, she waited outside the courtroom, but the jurors were escorted out of the courtroom in the judge's elevator, preventing her from asking the jurors if they would be willing to speak with the defense. Counsel asserted that she needed to contact the jurors to determine if any of them viewed or listened to any inadmissible evidence, noting that the prosecutor had submitted CDs containing inadmissible evidence as exhibits. Counsel summarized the proceedings regarding the unadmitted jail calls included in People's exhibit Nos. 46A, 48, and 49. Counsel asserted there may have been other exhibits containing inadmissible evidence that had been submitted to the jury. This information was relevant to a motion for a new trial and an appeal.

As discussed above, in a postverdict final exhibit list, the prosecutor explained that additional exhibits with inadmissible evidence had been submitted, but that none of the exhibits containing unadmitted evidence had been reviewed by the jury, as reflected by a review of information on a laptop the jury had available during deliberations showing recent files that had been opened.

At the March 17, 2023, hearing on defendant's petition, defense counsel noted that in addition to the points she had made in her petition, the prosecutor had filed an exhibit list indicating

39

an additional CD that contained unadmitted evidence. The prosecutor stated that his exhibit list included screenshots from the laptop given to the jury showing which files were accessed, and offered to present that laptop to the court. The court stated there was no need, since it had presided over the trial.

Defense counsel argued that the court had precluded the defense from trying to speak to the jurors after the verdict, and if the court denied her petition, she would be unable to determine whether the jury had relied on inadmissible evidence in reaching its verdict. The court found that defense counsel's "statements that were just made about the court foreclosing you from doing certain things" was "a misstatement and inaccurate." The court also found her declaration in support of the petition "full of misstatements or interpretations as you put them."

The court then summarized the proceedings. It noted that the jurors had been instructed with CALCRIM No. 3590.[21] Then, relying upon *People v. Santos* (2007) 147 Cal.App.4th 965 (*Santos*), it indicated that it had permitted the jury to exit the courtroom through the judges' elevator, but did so not to prevent

---

[21] That instruction provides: "You have now completed your jury service in this case. On behalf of all the judges of the court, please accept my thanks for your time and effort. [¶] Now that the case is over, you may choose whether or not to discuss the case and your deliberations with anyone. [¶] Let me tell you about some rules the law puts in place for your convenience and protection. [¶] The lawyers in this case, the defendant, or their representatives may now talk to you about the case, including your deliberations or verdict. Those discussions must occur at a reasonable time and place and with your consent. [¶] Please tell me immediately if anyone unreasonably contacts you without your consent. [¶] Anyone who violates these rules is violating a court order and may be fined. [¶] Again, thank you for your service. You are now excused."

40

the jurors from speak to anyone. Rather, it did so for several other reasons, including to prevent the jury from dealing with courtroom spectators who "got very emotional when the verdict was read."

The court summarized the relevant facts related to the unadmitted evidence. The parties agreed that if the jury requested to view or hear any video or calls, it would be provided with a "clean laptop" provided by the prosecution. When the court became aware that some exhibits included unadmitted evidence, the court removed all the CDs and the laptop from the jury room. The judicial assistant was informed by the jury that it had not yet gotten to the calls. Later, the court and parties learned that the laptop provided to the jury would not open any files on the CDs due to formatting issues. The court was "confident" that the jury had not reviewed any of the unadmitted calls because of the computer's formatting issues and what the jurors told the judicial assistant.

The court found that the petition and defense counsel's supporting declaration failed to establish a prima facie case of juror misconduct, noting counsel had not even alleged juror misconduct, but prosecutorial misconduct. It also found defense counsel's allegation that the jury could have listened to inadmissible evidence speculative.

B. <u>Relevant law</u>

In a criminal case, jurors' personal identifying information such as their names and phone numbers must be sealed after the verdict is recorded. (Code Civ. Proc., § 237, subd. (a); *People v. Johnson* (2013) 222 Cal.App.4th 486, 492.) A defendant or defendant's counsel may petition the court for access to such information for the purpose of developing a new trial motion or any other lawful purpose. (Code Civ. Proc., § 206, subd. (g).) Such a petition must be supported by a declaration that includes

41

facts sufficient to establish good cause for release of juror identifying information. (Code Civ. Proc., § 237, subd. (b).)

To demonstrate good cause for the release of juror identifying information, a defendant must make "'a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial.'" (*People v. Jones* (1998) 17 Cal.4th 279, 317.) Good cause does not exist where allegations of juror misconduct are speculative, conclusory, vague, or unsupported. (*People v. Munoz* (2019) 31 Cal.App.5th 143, 165; *People v. Wilson* (1996) 43 Cal.App.4th 839, 852.)

"We review [the trial court's] order on a motion for disclosure of jurors' identifying information under the deferential abuse of discretion standard." (*People v. Johnson*, *supra*, 222 Cal.App.4th at p. 492.)

C. Analysis

Applying these legal principles, we conclude that the trial court did not abuse its discretion.

1. *No good cause warranting disclosure of contact information*

Defendant failed to establish good cause warranting disclosure of the jurors' contact information. As noted by the court, neither the petition itself or defense counsel's supporting declaration alleged juror misconduct. Rather, all she asserted was that the prosecutor committed misconduct by submitting exhibits containing inadmissible evidence to the jury.

Defense counsel wanted to contact the jurors to investigate whether they had considered evidence that was improperly given to them. But, the record of the inquiry made by the parties and court during deliberations shows that the jury did not and could

42

not have engaged in the potential misconduct alleged by defendant: the CDs containing unadmitted evidence were pulled from the jury room before they could listen to or view them. Also, the judicial assistant reported[22] that the jurors had stated that they had not viewed the CDs containing unadmitted evidence, and the laptop given to the jurors could not access the files on the CDs. Even though defendant had the opportunity to challenge these facts below, he presented nothing during the proceedings regarding the exhibits in question to show that the jury actually viewed or listened to any inadmissible evidence. Under these circumstances, the trial court reasonably concluded that defendant failed to make a sufficient showing to support a reasonable belief that juror misconduct had occurred.[23] (See *People v. Jones*, *supra*, 17 Cal.4th at p. 317; *People v. Wilson*, *supra*, 43 Cal.App.4th at p. 852 [good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague, or unsupported].)

Defendant argues that the trial court improperly made credibility determinations in connection with his motion. Assuming without deciding that the court's finding that defense counsel's declaration was full of misstatements was improper, the court still correctly noted that the petition and declaration failed

---

[22] On appeal, defendant contends that the trial court improperly considered the judicial assistant's hearsay statement and the prosecutor's uncorroborated assertion that the files could not be played on the laptop. But defendant did not raise these objections below, forfeiting them on appeal. (Evid. Code, § 353, subd. (a); *Gallagher v. Connell* (2004) 123 Cal.App.4th 1260, 1268 [failure to make hearsay objection below forfeits the objection on appeal]; *People v. Zapien* (1993) 4 Cal.4th 929, 979.)

[23] It follows that defendant's contention that there is a presumption of prejudice arising from juror misconduct fails.

to allege juror misconduct.  Nor could defense counsel ever do so. At the risk of sounding redundant, the unadmitted evidence was removed from the jury before they could review it.

2. *Permitting the jury to leave the courtroom via private elevator*

Defendant asserts that his due process rights under state law were violated because the court permitted the jury to leave the courtroom through the judge's private elevator.  As set forth in *Santos, supra,* 147 Cal.App.4th at pages 978 to 980 [a criminal defendant has no guaranty of posttrial access to jurors or a right to question them about their guilty verdict], there was no state law due process violation.  (See also *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1092; *People v. Cox* (1991) 53 Cal.3d 618, 698–699, overruled in part on other grounds in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22; *People v. Singh* (2012) 206 Cal.App.4th 366, 372 [permitting a jury to leave by a private exit did not violate a defendant's right to be personally present at critical stage of proceedings].)

VI. *Cumulative error*

In light of our conclusion that no error—let alone prejudicial error—occurred below, defendant's claim of cumulative error fails.[24]  (*People v. Duff* (2014) 58 Cal.4th 527, 562.)

---

[24]    At most, the trial court erred in admitting the .45 caliber gun into evidence.  But that one assumed error is insufficient to establish cumulative error.  (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
ASHMANN-GERST

We concur:


_____, P. J.
LUI


_____, J.
HOFFSTADT